OHIO VALLEY ADVERTISING CORPORATION, *et al.*

*v.*

UNION LOCAL 207, SIGN PAINTERS, A. F. OF L., *et al.*

(No. 10524)

Submitted April 21, 1953. Decided June 2, 1953.

356

*Carl G. Bachmann* and *Gilbert S. Bachmann,* for appellants.

*Russell G. Nesbitt,* for appellees.

BROWNING, JUDGE:

This suit for injunctive relief was instituted in the Circuit Court of Ohio County on April 23, 1951, by the Ohio Valley Advertising Corporation and Daniel T. Gold, an individual suing on behalf of himself and others similarly situated, against Union Local 207, Sign Painters, A. F. of L., Delbert Horstemeyer, Business Manager of said Union, Wilson E. Connelly, President of Wheeling Building Trades Council, and all others abetting and conspiring with said defendants.

The bill of complaint, as amended, alleges in substance that the plaintiff corporation is in the advertising business in the City of Wheeling, and within a radius of fifty-five miles thereof, conducting its business under the "open shop" plan. The defendant, Union Local 207, is allegedly composed of independent contractors, with but two exceptions, possessing a union charter and affiliated with the A. F. of L. and the Wheeling Building Trades Council. The bill then alleges that the defendants have conspired against the plaintiff corporation, reciting three specific instances which amount to secondary boycotting, thereby causing them great financial loss, and concludes with a prayer that the defendants be restrained from engaging in such practices.

To this bill of complaint the defendants filed their plea in abatement, a special plea and demurrer.

The plea in abatement is based upon the ground that the bill shows on its face that plaintiff is engaged in interstate commerce, and, therefore, in the absence of an allegation of violence, any relief lies within the exclusive jurisdiction of the National Labor Relations Board. The special plea prayed for dismissal of Daniel Gold as a party plaintiff, alleging that Gold, at the time of the alleged conspiracy, was a member in good standing of Local 207, and, therefore, without clean hands. Defendants demurred on the ground that granting the injunction would abridge the defendants' rights of freedom of speech, press and assembly as guaranteed by the Constitutions of the United States and West Virginia.

These pleadings were overruled by the court and the defendant answered denying the material allegations of the bill of complaint.

Upon the trial of the cause, the plaintiff corporation adduced the evidence of several witnesses who had declined to deal with the plaintiff because of representations made to them by defendants that workers in other crafts would refuse to work beside plaintiff's employees.

In three specific instances, witnesses testified that they were visited by the defendants and informed that if they dealt with plaintiff corporation, usually in regard to signs being painted around the witnesses' places of business, it would be necessary to picket the situs of the sign. In one instance, the painting of a sign at an American Oil Company station in Wheeling, plaintiff's employees began work at 8:00 a. m., a picket appeared shortly thereafter bearing a sign "Men? Working on sign are not members of Sign Painters Local 207 A. F. of L.", who picketed the entire length of the service station property. The plaintiff, Gold, one of the men working on the sign testifies that he and the others left the job around 10:00 a. m. The service station manager testifies that the picket did not leave until 2:00 p. m. or shortly before, and that while he was there no business was done at the station.

The defendants, in their evidence, deny having threatened or coerced any individuals into cancelling their business with plaintiff corporation, though admitting that they had informed the various witnesses for plaintiff and others that plaintiff was employing nonunion labor. They do admit that in one or two instances they informed certain parties that if plaintiff was allowed to continue work it would be necessary to picket the sign being painted, and, in regard to the service station contend that the picket was picketing the sign and not the station.

Upon the conclusion of the evidence, the court granted a permanent injunction restraining defendants from:

(1) Doing any act to prevent plaintiff from lawfully operating its business or in any manner preventing plaintiff from lawfully engaging in its business.

(2) From in any way unlawfully disturbing or interfering with the normal conduct of plaintiff's business or the rights of the individual plaintiffs.

(3) From in any way interfering with the customers and lawful contracts, contractors or contractees of the

plaintiff by bringing pressure or influence upon such customers.

(4) From picketing plaintiff's customers and their places of business.

We must determine initially whether the trial court was correct in overruling the defendants' plea in abatement to the second amended bill of complaint. The allegations of plaintiffs' bill are to the effect that the Ohio Valley Advertising Corporation has its principal place of business in Wheeling, West Virginia, but that it operates in portions of the States of Ohio and Pennsylvania, thereby clearly showing that this plaintiff was engaged in interstate commerce. The defendants contend that this being true and no acts of violence having been alleged in the bill, the courts of this State do not have jurisdiction of the controversy.

This Court has not passed upon the question of the extent to which the Labor Management Relations Act of 1947, known as the Taft-Hartley Act, has preempted the field of labor relations where one of the participants in a labor dispute is engaged in interstate commerce, and violence is not alleged or proved. It is interesting to observe that the words "this power shall be exclusive", contained in Section 10(a) of the National Labor Relations Act, known as the Wagner Act, are not to be found in the Taft-Hartley Act. The absence of this language from the latter Act seems not to have changed the attitude of the courts of other jurisdictions upon the question. In *McNish* v. *American Brass Co.,* a Connecticut case decided in 1952, 89 A. 2d 566, the court said, quoting from *Schatte* v. *International Alliance, etc.,* 9 Cir., 182 F. 2d. 158, 166, that: "It is well settled that the exclusive remedy for the commission of an unfair labor practice was in proceedings before the National Labor Relations Board under the Wagner Act. 29 U.S.C.A. § 160 (a); *Amalgamated Utility Workers* v. *Consolidated Edison Co. of New York,* 1940, 309 U. S. 261, 60 S. Ct. 561, 84 L. Ed. 738. The same is true under the National

Labor Relations Act as amended by the Taft-Hartley Act, * * *." The Supreme Court of California held that the state court was without jurisdiction to entertain a petition for an injunction against peaceful picketing and secondary boycotting by a union in the absence of violence where the employer was engaged in interstate commerce. *Gerry of California* v. *Superior Court,* 1949, 194 P. 2d. 689.

The Supreme Court of the United States in *Amalgamated Ass'n. etc.* v. *Wisconsin Board,* 340 U. S. 383, 71 S. Ct. 359, 95 L. Ed. 383, decided in 1951, stated: " * * * Congress has closed to state regulation the field of peaceful strikes in industries affecting commerce." It will be observed that in the latter case, a Wisconsin State statute prohibiting strikes against public utilities and providing for compulsory arbitration was being attacked.

The Legislature of the State of West Virginia has not seen fit to enact labor management legislation as have the legislatures of most other states. However, it would appear that the result would be the same whether the conflict was created by state legislation or by judicial decision. *Building Service Employees* v. *Gazzam,* 1950, 339 U. S. 532, 70 S. Ct. 784, 94 L. Ed. 1045. We are of the opinion, however, that the trial court was correct in overruling defendants' plea in abatement inasmuch as plaintiffs' bill inter alia alleges that if certain named customers of the Ohio Valley Advertising Corporation did not cease to do business with the latter they would be "picketed and also black-listed or boycotted by the said defendants", and recited a specific instance of threats of physical violence against an employee of plaintiff. Such allegations are sufficient to give the courts of this State jurisdiction in labor disputes. Furthermore, we are in agreement with the trial court in its rulings upon the special plea and the demurrer.

The plaintiffs contend in their oral presentation and their brief that Union Local 207, Sign painters, one of the defendants, is not a labor union. This contention is

based upon testimony adduced at the trial to the effect that all but two or three of the members of this local union are engaged in contract work with their customers. Therefore, the plaintiffs say they were independent contractors and not employees. However, the bill of complaint refers to Union Local 207 as a labor organization, affiliated with the American Federation of Labor, and otherwise treats it as a labor union. During the course of the trial, counsel for defendants attempted to make an issue of the question of whether Union Local 207 was a bona fide union, but were unsuccessful. Counsel for the defendants inquired of the court as to whether the fact that Union Local 207 was a bona fide union was being disputed by the plaintiffs, and counsel for the latter replied: "We don't say it is material, and I don't think we have ever taken the position it is material." If, as contended by counsel for plaintiffs, Union Local 207 is not a trade union, but an association of employers engaged in allegedly unfair trade practices against another employer in the same area, the action against it should have been based upon such unfair trade practices rather than treating this particular defendant as a trade union in the pleadings. Counsel for defendants on another occasion asked the court to require the plaintiffs to state on the record what their position was in regard to the matter, but were unsuccessful, and the court sustained objections to questions put by counsel for defendants to an official of the American Federation of Labor in an effort to establish that Union Local 207 was a labor union. The trial court did not pass upon this question in its decree, and it is not now before us.

A large number of customers of the Ohio Valley Advertising Corporation testified to conversations with members of Union Local 207, and other defendants relative to their contracts with the advertising corporation. The plaintiffs contend that these transactions constituted coercion and intimidation, as the court apparently held, while the defendants maintained that they were merely informing these persons and firms of the fact that the

advertising corporation was employing nonunion labor, and urging them not to do business with it for that reason, which activity they contend is lawful. It is not denied that these customers were advised that picketing would result if they continued to use the services of the advertising corporation and its employees, but it seems clear from the testimony of these customers that it was the work of sign painting that was to be picketed and not the business of the customer. A promise by one that he will do a lawful thing if the other does not comply with his wishes is not a threat. The plaintiffs maintain that such conduct on behalf of the defendants constituted a secondary "boycott". We quote the word boycott because of the many and varied legal interpretations that have been placed upon that word, and find from a rather careful examination of the Taft-Hartley Act that the word is not used therein. However, conduct which is tantamount to such activities is carefully described, and Section 8 [T. 29 U.S.C.A. § 158] of the Act reads as follows:

> "(b) It shall be an unfair labor practice for a labor organization or its agents—
>
> " * * *
>
> "(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;* * *."

It will be noted that Section 8 prohibits even the peaceful inducement of the employees of a neutral employer

from engaging in a strike or a concerted refusal to handle goods or perform services where the object is to compel their employer to cease doing business with an employer involved in a labor dispute. However, persuasion of the neutral employer to cease doing business with the primary employer is not an unlawful labor practice prohibited by the Act.

The Supreme Court in *American Federation of Labor* v. *Swing*, 1941, 312 U. S. 321, 61 S. Ct. 568, 85 L. Ed. 855, held, in interpreting an Illinois picketing statute, that: "A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him."

The Supreme Court of the United States, in one of the leading cases on the subject, *Thornhill* v. *Alabama*, 1940, 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 1093, said: "In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution." In the same opinion, the court further said: "The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment.* * * "

The long, preliminary skirmishing between the Ohio Valley Advertising Corporation and Union Local 207 finally reached a climax on April 23, 1951 when employees of the former began painting a sign for the American Oil Company at a gasoline service station, owned by that company and operated under lease by Edward J. Conner, at 14th and Main Streets in the City of Wheeling, West Virginia. The sign was being painted on a wall to the rear, but in the proximity of, the gasoline pumps, all of which was clearly visible to those who passed by, both motorists and pedestrians. As heretofore

related, a single picket appeared shortly after the sign painting began, and there is little, if any, conflict in the testimony as to the circumstances surrounding the picketing. The picket marched up and down in front of the place where the sign was being painted, which meant that he also was walking in front of the service station itself. He remained at all times on the sidewalk, and there is no contention that he interfered with the normal flow of pedestrian traffic thereon. The testimony and photographs introduced in evidence clearly show that the sign which he wore on his body had the insignia, both on the front and back:

"MEN? WORKING
ON SIGN
ARE NOT
MEMBERS
OF SIGN PAINTERS
LOCAL 207
A. F. of L."

There is no denial either of the testimony of Conner, the operator of the service station, that no matter what the sign may have said that business practically ceased at his station while the picket remained on the job. We must, in considering the main issue thus presented, as to whether this picketing constituted a secondary boycott of the filling station, and, was, therefore, unlawful, first resolve what is perhaps the more intricate problem of whether the defendants had a lawful right to picket the work being done upon the sign itself. No one has questioned the right of the union to picket the principal place of business of the Ohio Valley Advertising Corporation, which procedure was followed over a long period of time. Such picketing, because of the ambulatory nature of that company's business, was ineffective, and the defendants elected to follow a procedure which would more forcefully bring to the attention of the public the fact that the advertising corporation's employees were not members of the sign painter's union of the A. F. of L.

*Bakery & Pastry Drivers Local* v. *Wohl*, 1942, 315 U. S. 769, 62 S. Ct. 816, 86 L. Ed. 1178, dealt with the question of the rights of a union to picket independent peddlers and small retail bakeries to whom they made deliveries. In reversing an injunction decree which had been sustained by the New York Court of Appeals, the Supreme Court said: "A state is not required to tolerate in all places and all circumstances even peaceful picketing by an individual. But so far as we can tell, respondents' mobility, and their insulation from the public as middlemen make it practically impossible for petitioners to make known their legitimate grievances to the public whose patronage was sustaining the peddler system except by the means here employed and contemplated; and those means are such as to have slight, if any, repercussions upon the interests of strangers to the issue." The Supreme Court in distinguishing its holding in another case handed down on the same day had this to say: "The line drawn by Texas in this case is not the line drawn by New York in the Wohl case. The dispute there related to conditions under which bakery products were sold and delivered to retailers. The business of the retailers was therefore directly involved in the dispute. In picketing the retail establishments, the union members would only be following the subject-matter of their dispute." *Carpenters & Joiners Union of America, et al.* v. *Ritter's Cafe, et al.*, 315 U. S. 722, 62 S. Ct. 807, 86 L. Ed. 1143.

While we do not say that all businesses of an ambulatory nature may lawfully be picketed at whatever place the employees of that concern may be at work, we are of the opinion that the peculiar nature of the work done by the Ohio Valley Advertising Corporation brings this case squarely within the holding of the *Wohl* and other similar cases of the Supreme Court of the United States. Therefore, we hold that the picketing of the painting of the sign at the American Oil Company service station was permissible as long as the information contained upon the picket's banner was true and clearly showed

that the picketing was limited to the painting of the sign. *Blossom Dairy Co.* v. *International Brotherhood of Teamsters,* 125 W. Va. 165, 23 S. E. 2d. 645.

In discussing the right to picket where the business of a primary employer has a roving situs, the Second Circuit Court of Appeals in *N.L.R.B.* v. *Service Trade Chauffeurs, etc.,* 1951, 191 F. 2d. 65, said: "We have here a problem involving the rights of neutrals in a lawful economic war between an employer and a union. The Taft-Hartley Act does not completely shelter neutrals— in this case, so-called 'secondary' employers. If it did, strikes would often be hopelessly crippled. Instead the Act recognizes and undertakes to reconcile the competing claims of unions to strike and of bystanders to be free of harm from so-called 'secondary boycotts.'" It was held in that case that picketing of the premises of a secondary employer is primary if it meets the following conditions: "(a) The picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the situs; (c) the picketing is limited to places reasonably close to the location of the situs; and (d) the picketing discloses clearly that the dispute is with the primary employer." This Court approves the rules laid down therein governing picketing of the premises of a secondary employer, and an examination of the facts in the case under consideration shows that all were strictly complied with.

In *N.L.R.B.* v. *Service Trade Chauffeurs, etc., supra,* it was said: "We take this to mean that a union may lawfully inflict harm on a neutral employer, without violating § 8 (b) (4), so long as the harm is merely incidental to a traditionally lawful primary strike, conducted at the place where the primary employer does business."

As was said in *International Brotherhood* v. *Missouri*

*Pacific Co.*, 1949,.220 S.W. 2d. 219: "Injury from lawful picketing is damnum absque injuria."

The principles which have been established by congressional acts and judicial determination in defining rights of participants in industrial disputes may seem harsh, particularly as they are applied to so-called neutrals in such disputes. This Court, however, is bound by Acts of the Congress and by the decisions of the Supreme Court of the United States. It has now been, we believe, well established that it is repugnant to the First and Fourteenth Amendments to the Federal Constitution to deny the right of free communication to either party engaged in an industrial dispute, and this right is not limited to the employer and his employees who are directly involved in a controversy so long as the publication is unattended by violence, coercion, or conduct otherwise unlawful.

Appellees rely for an affirmance of the decree of the lower. court upon the decision of this Court in *Parker Paint and Wallpaper Co.* v. *Local Union No. 813 et al.*, 87 W. Va. 631, 105 S. E. 911. In that case, decided in 1921, an injunction granted by the Judges of this Court upon the refusal of the circuit court to do so was by the latter dissolved, and upon appeal reinstated by the Supreme Court of this State. We believe that the facts in that case may be clearly distinguished from those in the case under consideration, and as was said in *Blossom Dairy Co.* v. *International Brotherhood of Teamsters, supra,* in referring to the *Parker Paint and Wallpaper Co.* v. *Local Union No. 813 et al., supra,* case: " * * * That case involved secondary picketing, was accompanied by great violence, and did cause the breach of a number of business and commercial contracts between the employer and its customers. * * * "

As was said in *Edwards, et al.* v. *Commonwealth,* 1950, 191 Va. 227, 60 S. E. 2d. 916: "The pattern which emerges to shape the boundaries of State action seems to be that picketing is subject to regulation by the State,

either by legislation or by court action. But such regulation must have a reasonable basis in prevention of disorder, restraint of coercion, protection of life or property, or promotion of the general welfare. The instrument of State action, whether judicial process or legislative enactment, must be specifically directed to acts or conduct which overstep legal limits, and not include those which keep within the protected area of free speech."

We do not consider it necessary to discuss in detail or determine whether the final decree of the trial court was too broad, and dealt in legal generalities rather than to specifically advise the parties of their rights under it, in view of the position we have taken with reference to the merits of the case. However, we do approve the statement contained in the opinion of the Supreme Court of the United States in *Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 1941, 312 U. S. 287, 61 S. Ct. 552, 85 L. Ed. 836, to the effect that: "In the exceptional cases warranting restraint upon normally free conduct, the restraint ought to be defined by clear and guarded language. According to the best practice, a judge himself should draw the specific terms of such restraint and not rely upon drafts submitted by the parties."

For the foregoing reasons, the decree of the Circuit Court of Ohio County is reversed and the bill of complaint of the plaintiffs is dismissed.

*Reversed; bill dismissed.*