MCJUNKIN CORPORATION

*v.*

BELL LINES, INC. *et al.*

(CC 845)

Submitted January 21, 1959.     Decided April 7, 1959.

*Spilman, Thomas, Battle & Klostermeyer, Howard R. Klostermeyer, Blagg, Stone, Mauzy, Anderson & Bowles, A. G. Stone, Payne, Minor, Ray, Price & Loeb, John V. Ray,* for plaintiff.

*Amos, Brotherton & Keightley, W. T. Brotherton, Jr., Poffenbarger & Bowles, Martin C. Bowles, Leonard H. Higgins,* for defendants.

GIVEN, PRESIDENT:

In this proceeding, certified to this Court by the Circuit Court of Kanawha County, the plaintiff, McJunkin Corporation, filed its bill of complaint in the circuit court on March 11, 1957, praying that a mandatory injunction, both temporary and permanent, be awarded against the defendant, Bell Lines, Inc., requiring the defendant, an interstate and intrastate motor vehicle common carrier of freight to transport merchandise to and from the plant of plaintiff, in Charleston, West Virginia, and for recovery of damages occasioned by previous refusals of the defendant to transport such merchandise. On that day, the Bell Lines, Inc. having had proper notice, and its counsel being present in court, plaintiff moved the court for a temporary mandatory injunction requiring Bell Lines, Inc., "its officers, agents and employees who choose to work or remain in the employment of the defendant * * * to perform for plaintiff the statutory and common law duties of the common carrier by motor vehicles in accordance with the prayer of the bill of complaint". The court, finding from the allegations of the bill of complaint that the plaintiff was "suffering irreparable loss, injury and damages and is without remedy save in a court of equity", awarded "the injunction prayed for", the same to be effective "until further order" of the circuit court.

The pertinent allegations of the bill of complaint are to the effect that the plaintiff is a corporation, with its principal place of business in Charleston, West Virginia, and ships and receives both intrastate and interstate goods, including heavy machinery and equipment, and employs about 175 persons; that the value of goods shipped annually is in excess of one million dollars; that the Bell Lines, Inc. is a common carrier of property, "under the laws of the State of West Virginia"; that on February 19, 1957, "a small group of former employees of plaintiff who had been laid off because of lack of work, along with other persons", commenced to "picket" the plant of plaintiff; that the pickets carried signs bearing

the words "On Strike"; that the "pickets and other persons combining and confederating * * * have persuaded and importuned the agents and employees of the defendant to disregard their duties * * * and to cease the delivery of merchandise consigned to the plaintiff, and to cease receiving and removing" merchandise from the plant of the plaintiff; that the defendant "without being subjected to or threatened with physical violence or bodidly harm, has declined and refused" to accept from or deliver to plaintiff any merchandise; that the defendant has discriminated against plaintiff, "in violation of the laws of the State of West Virginia", and intends to continue to do so; that the discrimination against plaintiff has resulted in loss of customers and business "incapable of measurement in money", and that it has suffered, is suffering and will continue to suffer irreparable damages, unless the illegal actions complained of are enjoined.

On May 13, 1957, the Bell Lines, Inc. filed its plea in abatement, alleging, in effect, that the Circuit Court of Kanawha County did not have jurisdiction over the subject matter of the cause, for the reason that the Legislature of the State of West Virginia had delegated exclusive jurisdiction of such matters to the Public Service Commission of West Virginia, as it relates to intrastate commerce, and "that the Congress of the United States of America * * * has delegated the exclusive jurisdiction to hear and determine questions of unreasonableness, unfairness and discriminatory practices on the part of private carriers of property by motor vehicles to the Interstate Commerce Commission, as it relates to interstate commerce", and that the facts alleged constitute " a confederation and conspiracy among and between the striking workers of the plaintiff and the employees of the defendant, and the facts alleged in that connection, if true, would create a situation wherein the allegation is that of an 'unfair labor practice' and 'concerted activities' within the meaning of the federal Labor-Management Relations Act, 29 U.S.C.A., Sections 157 and 163 et seq", and that the "sole and exclusive jurisdiction in such mat-

ters is vested in the National Labor Relations Board".

On October 5, 1957, Elmer Lockhart, E. O. Woodall, Harrious Blankenship and H. D. Johnson, as employees of Bell Lines, Inc., and as members of Chauffeurs, Teamsters and Helpers Local Union No. 175, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, on behalf of themselves "and all others similarly situated", filed in the case a petition praying that they be permitted to intervene in the case and that they and "the class of which they are members" be made parties defendant in the case. For brevity the parties may be designated as intervenors. The court, having considered objections and a demurrer to the petition of the intervenors, filed the petition and adjudged that the intervenors be made parties defendant, individually, but denied the right of the intervenors to be made parties defendant as members of Local Union No. 175, or as members of the class mentioned. The bill of complaint was accordingly amended.

The pertinent allegations contained in the petition of the intervenors were to the effect that they were employees of the Bell Lines, Inc.; that they were members of the above mentioned Local Union No. 175; that they represented a large class in number of employees of Bell Lines, Inc., and "who are so numerous as to make it impracticable to bring them before the Court"; that the effect of the mandatory injunction issued in the case "is to require your petitioners, and the class which they represent and of which they are members, to pass through a lawful picket line established for a lawful purpose by Chauffeurs, Teamsters and Helpers Local Union, No. 175", and to handle "unfair goods"; that such picket line was at the plant of the plaintiff; that the injunction would compel intervenors and the class to violate "a collective bargaining agreement", entered into between such employees and the Bell Lines, Inc.; that a labor dispute existed at the plant of plaintiff, between it and its employees, who were also members of the Teamsters'

Union; that the picket line was "lawful" and without violence or threat of violence, and that the collective bargaining agreement then in effect between Bell Lines, Inc. and its employees provided, in Article 9 thereof, as follows: "It shall not be a violation of this Agreement and it shall not be cause for discharge if any employee or employees refuse to go through the picket line of a Union or refuse to handle unfair goods. Nor shall the exercise of any rights permitted by law be a violation of this Agreement. The Union and its members, individually and collectively reserve the right to refuse to handle goods from or to any firm or truck which is engaged or involved in any controversy with this or any other Union; and reserves the right to refuse to accept freight from, or to make pickups from, or deliveries to establishments where picket lines, strikes, walk-outs or lockouts exist." The answer of the intervenors to the amended bill of complaint, filed November 19, 1957, insofar as appears material, contained allegations to the same general effect as the allegations contained in their petition praying to be made parties defendant.

The answer of the Bell Lines, Inc. to the original and amended bill of complaint filed December 5, 1957, insofar as material here, alleges that "a labor dispute is in progress at the plant of the plaintiff and a picket line has been established and maintained at the entrance thereto"; that as a common carrier it has filed tariffs with the Interstate Commerce Commission; that such tariffs contain an "Impracticable Operation" provision to the effect that nothing "shall require the carrier to perform pickup or delivery service at any location from or to which it is impracticable to operate vehicles because of: (1) The condition of roads, streets, driveways, alleys or approaches thereto; (2) Inadequate loading or unloading facilities; (3) Any riot, strike, picketing or other labor disturbance"; that "as a result of said labor dispute and picketing, as aforesaid, it was and is impracticable for the defendant to pick up and deliver goods at the plant of plaintiff and that, under such conditions as aforesaid,

the defendant is under no duty or obligation as a matter of law to render pick-up and delivery service at the plant of plaintiff"; that it entered into and abided by the collective bargaining agreement mentioned in the petition of the intervenors; that it has not discriminated against the plaintiff in any manner; and that the matters complained of are within the exclusive jurisdiction of the National Labor Relations Board. The answer, in effect, admits that the Bell Lines, Inc. has refused to make "deliveries to and pick-ups from plaintiff's plant and place of business" because of the existence of a labor dispute, and in accordance with the provisions of the collective bargaining agreement and the Impracticable Operation provision.

Plaintiff demurred to the answer of the Bell Lines, Inc. to the original and amended bill of complaint, and to the answer of the intervenors to the original and amended bill of complaint. The demurrers of plaintiff are, insofar as presently material, based on the same grounds, and the action of the circuit court on the demurrers gives rise to the questions material to a decision of the present controversy.

On February 26, 1957, the plaintiff filed with the National Labor Relations Board a charge that Local Union No. 175, mentioned above, was engaged in "unfair labor practices", in that it was "picketing the plant and premises of the charging party, on Hansford Street, in Charleston, West Virginia", setting out fully the bases of the charge, and alleging that the object of such conduct was the "forcing and requiring said employers to cease using, selling, handling, transporting, or otherwise dealing in the products of the charging party", and that the further object thereof was the "forcing or requiring the charging party to recognize and bargain with" the named labor organization. An amended charge was filed on March 15, 1957, but the amendment seems immaterial here. After usual investigations the National Labor Relations Board, by its regional director, 9th Region, filed a complaint against the named union, charging it with

having "engaged in, and is engaging in, unfair labor practices as defined in Section 8 (b) (4) (A) of the Act 'affecting commerce' as defined in Section 2 (6) and (7) of the Act".

After the execution of an agreement by the interested parties, and in accordance with the provisions thereof, the National Labor Relations Board entered an order requiring "Respondent, Chauffeurs, Teamsters and Helpers Local Union No. 175, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO, and its officers, representatives and agents shall: A. Cease and desist from engaging in, or by orders, instructions, directions, picketing, or appeals, or by any like or related acts or conduct, or by permitting any such to remain in existence or effect, inducing or encouraging the employees of O. K. Trucking Company * * * [naming employers] or of any other employers other than McJunkin, to engage in a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, materials, articles, or commodities, or to perform any services for their employers where an object thereof is to force or require said employers or any other employer or person to cease using, selling, handling, transporting or otherwise dealing in the products of McJunkin, or to cease doing business with Mc-Junkin".

Subsequently, a petition praying for a temporary injunction enjoining Local Union No. 175 from engaging in certain acts and conduct pending the final adjudication of the National Labor Relations Board was filed in the United States District Court for the Southern District of West Virginia, and a show cause order was entered thereon. As shown by the order of the Court, entered March 13, 1957, the respondent, Local Union No. 175, stipulated that "pending final adjudication of the National Labor Relations Board" of the controversy mentioned, it would not "picket at the premises" of cer-

tain named employers, "or any other employer or person who does business with McJunkin".

As above noticed, the circuit court denied the right of the intervenors to be made parties defendant as representatives of a class, the employees of defendant Bell Lines, Inc., or of the union to which they belonged, notwithstanding the petition praying permission to intervene clearly alleged facts establishing the existence of a labor dispute, within the meaning of the pertinent federal legislation, and that a large number of employees and members of the union would be affected by the awarding of the injunction prayed for in the bill of complaint. We need not stop to inquire whether, under the State practice, the prayer contained in the petition to intervene should have been allowed. Where the matter involved is such that it falls within the reaches of the federal legislation, in a field wherein the federal legislation is supreme, the rights of the parties must be heard and determined and State procedure or State legislation can not preclude such federal rights. To hold otherwise would, in effect, substitute the policy or law of the State for that of the national government. We do not overlook the fact that the injunction prayed for would merely require such employees "who choose to work or remain in the employment of the defendant" to serve plaintiff, but if the collective bargaining agreement is to have the effect intended by the Congress, it must do more than require an employee to choose between leaving his job, or violating the agreement. The phrase quoted is useful, in proper circumstances, but can not be used to deny the benefits of a collective bargaining agreement to those who make it. In *Garner* v. *Teamsters, Chauffeurs and Helpers Local Union No. 776*, 346 U. S. 485, 500, 74 S. Ct. 161, 98 L. ed. 228, after considering State legislation deemed in conflict with the National Labor Relations Act, as amended, the court said: "We conclude that when federal power constitutionally is exerted for the protection of public or private interests, or both, it becomes the supreme law of the land and cannot be cur-

tailed, circumvented or extended by a state procedure merely because it will apply some doctrine of private right. To the extent that the private right may conflict with the public one, the former is superseded * * *". See *Weber* v. *Anheuser-Busch, Inc.*, 348 U. S. 468, 75 S. Ct. 480, 99 L. ed. 546; *Hill* v. *State of Florida ex rel. Watson, Attorney General*, 325 U. S. 538, 65 S. Ct. 1373, 89 L. ed. 1782.

Though numerous questions are certified to this Court, we think the controlling questions relate to the jurisdiction of the circuit court to enter the decree awarding the temporary mandatory injunction, and that such questions, in turn, depend on whether the National Labor Management Relations Act is to be applied in the circumstances of this case. The most pertinent provisions of that Act are: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title." 29 U.S.C., Section 157; and "(b) It shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances; (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied

or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; (3) to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 159(a) of this title; (4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *". 29 U.S.C., Section 158.

In *Youngdahl* v. *Rainfair, Inc.*, 355 U. S. 131, 78 S. Ct. 206, 2 L. ed. 2d 151, the Supreme Court of Arkansas had affirmed the action of a trial court in enjoining strikers and union representatives from threatening violence and "all picketing or patrolling" of certain premises. On certiorari to the Supreme Court it was concluded that insofar as the injunction prohibited the threatening of "* * * violence against, or provoking violence on the part of, any of the officers, agents or employees or respondent and prohibits them from obstructing or attempting to obstruct the free use of the streets adjacent to respondent's place of business, and the free ingress and egress to and from that property, it is affirmed. On the other hand, to the extent the injunction prohibits all other picketing and patrolling of respondent's premises and in particular prohibits peaceful picketing, it is set aside * * *". This case is clear authority for two propositions: First, that insofar as the action of the State court attempts to regulate conduct falling within the reaches of the federal legislation, the State court

is without jurisdiction, to that extent jurisdiction has been by the Congress pre-empted; and, secondly, that the federal legislation leaves open to the State courts certain phases or questions within the particular field, though the complaint arises from a labor controversy. See *Weber* v. *Anheuser-Busch, Inc., supra; Garner* v. *Teamsters, Chauffeurs and Helpers Local Union No. 776, supra; United Construction Workers* v. *Laburnum Construction Corp.*, 347 U. S. 656, 74 S. Ct. 833, 98 L. ed. 1025; *International Union, United Automobile, Aircraft and Agricultural Implement Workers of America* v. *Russell*, 356 U. S. 634, 78 S. Ct. 932, 2 L. ed. 2d 1030; *National Labor Relations Board* v. *International Rice Milling Co., Inc.*, 341 U. S. 665, 71 S. Ct. 961, 95 L. ed. 1277; *International Brotherhood of Electrical Workers* v. *National Labor Relations Board*, 341 U. S. 694, 71 S. Ct. 954, 95 L. ed. 1299; *Association of Westinghouse Salaried Employees* v. *Westinghouse Electric Corporation*, 348 U. S. 437, 75 S. Ct. 489, 99 L. ed. 510; *Allen-Bradley Local No. 1111* v. *Wisconsin Employment Relations Board*, 315 U. S. 740, 62 S. Ct. 820, 86 L. ed. 1154; *National Labor Relations Board* v. *Rockaway News Supply Co., Inc.*, 345 U. S. 71, 73 S. Ct. 519, 97 L. ed. 832; *Local Union No. 10, United Association of Journeymen, Plumbers & Steamfitters* v. *Graham*, 345 U. S. 192, 73 S. Ct. 585, 97 L. ed. 946; *Ohio Valley Advertising Corp.* v. *Union Local 207, Sign Painters, A. F. of L.*, 138 W. Va. 355, 76 S. E. 2d 113; Annotation 98 L. ed. 245; Annotation 32 A.L.R. 2d 829; Annotation 16 A.L.R. 2d 769.

In the instant proceeding, while the bill of complaint does not allege facts showing the existence of a labor dispute, the plea in abatement, the petition of the intervenors, and the answers to the bill of complaint disclose clearly that the plaintiff filed before the National Labor Relations Board a charge of unfair labor practices, that the board took jurisdiction of the dispute, and, after investigation, issued a "cease and desist" order against the union here involved, as to the very matters here under consideration, rights arising under the collective bar-

gaining agreement signed by defendant and its employees, and that proceedings were had thereon in the United States District Court for the Southern District of West Virginia. While it is true that the bill of complaint here, unlike the pleadings in the *Weber* case, as shown above, does not allege unfair labor practices, that fact is made to appear in this proceeding by proper pleadings of defendants. We think there exists no controlling difference in the manner of bringing to the attention of the Court the fact that a labor controversy existed, and that the National Labor Relations Board had assumed and was exercising jurisdiction. We do not say, of course, that the assumption of jurisdiction by the National Labor Relations Board in every case constitutes a final determination of jurisdiction, but, as pointed out by the Supreme Court in the *Weber* case, *supra*, "The point is rather that the Board, and not the state court, is empowered to pass upon such issues in the first instance".

As noted above, provisions of the collective bargaining agreement between Bell Lines, Inc. and its employees related to the right of the employees to "refuse to go through the picket line of a Union or refuse to handle unfair goods". Undoubtedly the federal legislation undertakes to guarantee unto employees coming under its influence the "right to self-organization * * * to bargain collectively * * * and to engage in other concerted activities * * * for * * * mutual aid or protection * * *". It would appear, therefore, that the federal legislation intends that rights of employees arising thereunder, at least in the usual case, be determined by the National Labor Relations Board, the agency designated by the Congress for that purpose. Only in that manner can uniformity in the particular field be obtained. In *Hill* v. *State of Florida ex rel. Watson, Attorney General*, 325 U. S. 538, 65 S. Ct. 1373, 89 L. ed. 1782, the Court held invalid State statutes which attempted to regulate actions of representatives of labor unions, as violative of the collective bargaining rights of employees arising under

the federal legislation. After pointing out the nature of the conflict between the State statutes and the federal Acts, the Court said: "Section 4 of the Florida act circumscribes the 'full freedom' of choice which Congress said employees should possess. It does this by requiring a 'business agent' to prove to the satisfaction of a Florida Board that he measures up to standards set by the State of Florida as one who, among other things, performs the exact function of a collective bargaining representative. To the extent that § 4 limits a union's choice of such an 'agent' or bargaining representative, it substitutes Florida's judgment for the workers' judgment.

"Thus, the 'full freedom' of employees in collective bargaining which Congress envisioned as essential to protect the free flow of commerce among the states would be, by the Florida statute, shrunk to a greatly limited freedom. No elaboration seems required to demonstrate that § 4 as applied here 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' Hines v. Davidewitz, 312 U. S. 52, 67, 85 L. ed. 581, 586, 61 S. Ct. 399; Cloverleaf Butter Co. v. Patterson, 315 U. S. 148, 86 L. ed. 754, 62 S. Ct. 491; Napier v. Atlantic Coast Line R. Co., 272 U. S. 605, 71 L. ed. 432, 47 S. Ct. 207 * * *". See *Amalgamated Association of Street, Electric Railway and Motor Coach Employees* v. *Wisconsin Employment Relations Board*, 340 U. S. 383, 71 S. Ct. 359, 95 L. ed. 364; *Local 24 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America* v. *Oliver*, decided January 19, 1959, 358 U. S. 283, 79 S. Ct. 297, 3 L. ed. 312; *Local No. 1976, United Brotherhood of Carpenters and Joiners of America* v. *National Labor Relations Board*, 357 U. S. 93, 78 S. Ct. 1011, 2 L. ed. 2d 1186.

The contention is made that the defendant, Bell Lines, Inc., being a common carrier of freight, is subject only to regulation by the Interstate Commerce Commission, as to its interstate business, and by the Public Service Commission of West Virginia, as to its intrastate busi-

ness, and that, notwithstanding the National Labor Relations Act, as amended, it may be mandatorily enjoined to perform its common law and statutory duties, and numerous authorities are cited as to the nature of such duties. Those duties are, perhaps, best described in *Northern Pacific Railway Company* v. *State of North Dakota on relation of McCue, Attorney General*, 236 U. S. 585, 35 S. Ct. 429, 59 L. ed. 735, wherein it is said: "* * * As a corporation, the owner is subject to the obligations of its charter. As the holder of special franchises, it is subject to the conditions upon which they were granted. Aside from specific requirements of this sort, the common carrier must discharge the obligations which inhere in the nature of its business. It must supply facilities that are reasonably adequate; it must carry upon reasonable terms; and it must serve without unjust discrimination. These duties are properly called public duties, and the State within the limits of its jurisdiction may enforce them. The State may prescribe rules to insure fair remuneration and to prevent extortion, to secure substantial equality of treatment in like cases, and to promote safety, good order and convenience". But the question of the nature of such duties is not here involved. Here it must be determined whether pertinent provisions of the federal Act, making no specific exceptions as to public carriers, are to control. We think the question has been determined.

In *Amalgamated Association of Street, Electric Railway and Motor Coach Employees* v. *Wisconsin Employment Relations Board, supra*, in considering this question the Court said: "The Wisconsin court sought to distinguish International Union of United Auto Workers v. O'Brien (US) supra, on the ground that the industry to which Michigan applied its notice and strike-vote provisions was a national manufacturing organization rather than a local public utility. Congress drew no such distinction but, instead, saw fit to regulate labor relations to the full extent of its constitutional power under the Commerce Clause, National Labor Relations Board v.

Fainblatt, 306 US 601, 607, 83 L ed 1014, 1019, 59 S Ct 668 (1939). Ever since the question was fully argued and decided in Consolidated Edison Co. v. National Labor Relations Board, 305 US 197, 83 L. ed 126, 59 S Ct 206 (1938), it has been clear that federal labor legislation, encompassing as it does all industries 'affecting commerce,' applies to a privately owned public utility whose business and activities are carried on wholly within a single state. The courts of appeal have uniformly held enterprises similar to and no more important to interstate commerce than the Milwaukee gas and transit companies before us in these cases subject to the provisions of the federal labor law. No distinction between public utilities and national manufacturing organizations has been drawn in the administration of the federal Act, and, when separate treatment for public utilities was urged upon Congress in 1947, the suggested differentiation was expressely rejected. Creation of a special classification for public utilities is for Congress, not for this Court". See *Local 24 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America* v. *Oliver, supra.*

In *Kerrigan Iron Works* v. *Cook Truck Lines,* 296 S. W. 2d 379 (Tenn.), the shipper obtained in the lower court an injunction to require a common carrier to continue rendering service to the shipper, notwithstanding the shipper's plant was being picketed by a union representing shipper's employees, and to restrain a different union from interfering with the performance of such service by the carrier. There existed a so called "hot cargo" clause in an agreement between the carrier and the union representing the employees of the carrier which permitted such employees to refuse to cross another union's picket line or to handle unfair goods. The Supreme Court of Tennessee held the conduct "unlawful" and in violation of the common law and the statutes of Tennessee, saying: "The subject matter of the suit is the controversy between the shipper and the carriers. It does not involve any employer-employee relation or any labor dispute. It does not involve the dispute between

complainant and its employees or seek to stop their picketing. The only conduct complained of is the conduct of the carriers in not rendering the service and the conduct of appellants in interfering to prevent such service", and further, "But whatever may be the nature of this right not to cross another union's picket line, it is not beyond the reach of state power when it is employed for a purpose contrary to state law. Indeed, the more important right of picketing or to strike is not beyond state control when it is employed for purposes made unlawful by state law * * *". On certiorari, the Supreme Court reversed, in a per curiam opinion, 353 U. S. 968, 77 S. Ct. 1055, 1 L. ed. 2d 1133. See, to the same effect, *Aladdin Industries* v. *Associated Transport, Inc.*, 298 S. W. 2d 770 (Tenn.), remanded on certiorari, 355 U. S. 8, 78 S. Ct. 12, 2 L. ed. 2d 22; *General Drivers, Warehousemen and Helpers Local Union No. 89* v. *American Tobacco Company*, 264 S. W. 2d 250 (Ky.), reversed on certiorari, 348 U. S. 978, 75 S. Ct. 569, 99 L. ed. 762.

Consideration of the pertinent decisions brings us to the conclusion that the petition to intervene and the answers filed establish that the questions involved in this proceeding fall within the exclusive jurisdiction of the National Labor Relations Board, or, at least, that board has the exclusive jurisdiction to determine the questions in the first instance.

The rulings of the Circuit Court of Kanawha County are reversed, insofar as they sustain demurrers to the answers, and the proceeding is remanded to that court with directions to dissolve the injunction awarded, and for such further proceedings as the parties may be advised.

*Rulings reversed;*
*remanded with directions.*