UNITED MAINTENANCE AND MANUFACTURING COMPANY INC.,
*a corporation*

*v.*

UNITED STEELWORKERS OF AMERICA,
*a corporation, et al.*

(No. 13405)

Submitted February 5, 1974.     Decided April 9, 1974.

*Moreland & DePond, William A. Moreland, Rudolph L. Milasich, Jr., Bredhoff, Cushman, Gottesman & Cohen, Kleiman, Cornfield & Feldman, Bernard Kleiman* for appellants.

*Kenneth E. Kincaid* for appellee.

SPROUSE, JUSTICE:

This case is before the Court upon an appeal from an order of the Circuit Court of Monongalia County overruling the appellants' motion to dissolve a temporary injunction previously entered by a special judge of that court. Appellants were the defendants below, the United Steelworkers of America, a labor union, and individual members of that union. They are hereinafter referred to as "the union." The court had enjoined the union from all picketing of the appellee, United Maintenance and Manufacturing Company, Inc., and enjoined them from committing any acts of violence or trespass. The injunction was issued upon the complaint and affidavit of United Maintenance without a hearing. Subsequently, a

hearing was held by the Circuit Court of Monongalia County on the union's motion to dissolve the injunction. After the hearing, the motion to dissolve was overruled.

The union had been certified on January 3, 1973 by the National Labor Relations Board as the collective bargaining representative of the employees of United Electric and Machine Company, a corporation, the predecessor corporation to United Maintenance. The business was conducted in a building located in the Morgantown Ordnance Park. United Electric had employed thirty-eight persons who were members of the union.

After the union was certified in January, 1973, negotiations were entered into between the union and United Electric, but they failed to reach a collective bargaining agreement. In March, 1973, the union struck United Electric and established a picket line at the entrance of the company's facilities. The union and United Electric never resolved their dispute. United Maintenance and Manufacturing Company, Inc.. a corporation, elsewhere referred to herein as United Maintenance, was incorporated on July 23, 1973, some four months after the strike against United Electric. On August 9, 1973, United Maintenance completed the purchase of United Electric.

The union was not formally advised of the sale, but this information was communicated to them when Lowell Cowell, the president of the new company, apprised union members on picket line duty on the morning of Monday, August 13, 1973, that the sale had been consummated. That same day, the union orally requested United Maintenance to recognize the appellant union as a certified collective bargaining representative of its employees, and requested that negotiations be continued with the new company. The oral requests were confirmed by letter from the union to the company on August 15, 1973. The picket line originally established against United Electric, was maintained until the issuance of the temporary injunction.

Lowell Cowell had been the principal foreman for United Electric. Cowell, his wife, and father are the sole stockholders of the new company. United Maintenance purchased all of the assets and took over the operation of United Electric and Machine Company, a corporation, agreeing to pay United Electric a total sum of $200,000. There was no initial payment, the entire sum being represented by a note secured by the assets of the company. Payment was to be made in monthly installments of $2,426.60 over a period of ten years. A new lease was negotiated from Morgantown Ordnance to United Maintenance at $2,000. a month rent.

Cowell had been a shop foreman for United Electric for approximately one year and a half, and before that was a machinist for that company for about two years. There were no common stockholders in United Maintenance and United Electric, although one of the former principal stockholders of United Electric, Mr. Falbo, was employed by United Maintenance at a salary of $1,700. per month. He was primarily responsible for solicitation of new accounts.

The principal business of United Electric, which was assumed by United Maintenance, was the repair of mining equipment. Its customers were both large and small coal mines inside the State of West Virginia, as well as mines located in other states. Cowell testified that United Electric's gross annual business was a little over $800,000. a year, and he anticipated that the volume of business for United Maintenance would be between $600,000. and $800,000. per year, of which $150,000. would be business from other states.

Sometime between August 9 and August 13, Lowell Cowell, the president of United Maintenance, wrote twenty-one former employees of United Electric asking them to come to work for the new company. They were asked to be at work by Monday, August 13, 1973. All twenty-one of these employees were union members at the time of the strike, and remained members of the

union. Cowell testified that fourteen or sixteen replied to his letter and indicated that they desired to work for the new company. Some of them appeared on August 13, but refused to cross the picket line.

There was no dispute as to the circumstances surrounding the picketing. The picket line was maintained on public property at the intersection of State Route 45 and County Road 19, and consisted for the most part of two pickets at a time. Cowell, the principal United Maintenance witness, testified there was no violence on the picket line, no mass picketing or picket line coercion of any kind. This was supported by testimony of witnesses for the union. Cowell testified that not only was he not aware of any violence on the picket line, but that he was not concerned about violence or physical blockage by the picket line. When asked then why he was seeking the injunction, he replied: "So that I can open up my business and hire the people that I wish to hire for my business and go about my business." During the four and one-half months of picketing until the time of the injunction, there had not been a single threat of violence or any incidents of mass picketing.

The exact language on the picket signs does not appear from the record, except testimony indicated that the signs were directed against United Electric rather than United Maintenance, and attempted to convey to others the existence of a labor dispute between the appellant union and United Electric.

Counsel for both parties indicate in their briefs that an unfair labor practice charge was filed by the union against United Maintenance with the National Labor Relations Board on August 29, 1973, but that the Board did not issue the complaint until October 29, 1973.

On August 17, 1973, two days after United Maintenance was requested in writing to negotiate with the appellant union, the company filed its complaint in the Circuit Court of Monongalia County for damages and a temporary

injunction. The complaint alleged United Maintenance to be a new company with no employees belonging to the union; that pickets had advised its intended employees not to proceed to work; and that the "defendants have, therefore, engaged in unlawful picketing of plaintiff's business operation." The complaint did not specify the manner in which this conduct violated the laws of West Virginia.

Attached to and made a part of the complaint was the affidavit of Lowell Cowell, the company's president, in which he swore, principally, that United Maintenance had attempted to open business on August 13, 1973, but that certain members of the union were picketing on the highway leading to Morgantown Ordnance Works, and on that date advised certain other individuals, who were intending to go to work for United Maintenance, not to cross the picket line; that United Maintenance has no contract with any labor union, nor has its employees elected to be represented by any labor organization.

The special judge on August 17, 1973, the date the complaint was filed, stating that it was not necessary to take evidence, granted the temporary injunction. The defendants were enjoined from " (a) picketing plaintiff's business operation at Morgantown Ordnance Works Industrial Park, or (b) committing any act of violence or trespass upon or against any property of the plaintiff." The union, on August 21, moved to dissolve the injunction. An evidentiary hearing was held on August 22 and August 23 with both United Maintenance and the union presenting evidence. The court, on August 27, 1973, overruled the union's motion. The court made no specific findings of fact or conclusions of law. An order was entered on August 28, 1973 containing the court's ruling, and it is from that order that this appeal is taken.

The union advances a host of contentions why the injunction issued by the Monongalia County Circuit Court should have been dissolved. It maintains principally that the court's action was violative of the First and

Fourteenth Amendments of the United States Constitution denying to its members guaranteed rights of free speech; and that the circuit court lacked jurisdiction because the labor dispute was one preempted by the Federal Congress to the exclusive jurisdiction of the National Labor Relations Board. The appellee, United Maintenance, contends on appeal that the activities of the union were illegal because they violated the law and public policy of the State. It maintains, therefore, that such activity is not protected as free speech under the umbrella of the First Amendment nor under the Due Process Clause of the Fourteenth Amendment. It argues that jurisdiction over the labor dispute was not preempted because the NLRB did not issue a complaint for some two months after the injunction was issued.

The two principal issues presented by the case must be considered under two separately developed areas of the law. The first relates to the free speech aspect of picketing as a constitutional issue. The second, although having its genesis in the United States Constitution, is now purely a question of construing the intent of Congress—whether it was the intent to preempt jurisdiction to the NLRB in a labor dispute of this character.

At one point in the development of this branch of our labor law, the only permissible inhibition of the exercise of free speech by the use of pickets was that such picketing not be attendant with violence, mass picketing, or other extreme negative action. So it is true, as the union argues, that the United States Supreme Court then broadly categorized industrial picketing as an exercise of free speech protected by the First Amendment. *Thornhill v. Alabama,* 310 U.S. 88. See also *Senn v. Tile Layers Protective Union,* 301 U.S. 468.

The court, however, in a long series of cases decided thereafter, while not abandoning *Thornhill,* drastically modified its pronouncements. *Bakery & Pastry Drivers & Helpers Local v. Wohl,* 315 U.S. 769; *Carpenters & Joiners Union of America v. Ritter's Cafe,* 315 U.S. 722;

*Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490; *Hughes v. Superior Court of California,* 339 U.S. 460; *International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Hanke,* 339 U.S. 470; *Building Service Employees International Union v. Gazzam,* 339 U.S. 532; *International Brotherhood of Teamsters v. Vogt, Inc.,* 354 U.S. 284.

These later cases recognize that while the communication element of picketing must be protected as an exercise of free speech, there are other elements of picketing which go beyond the constitutionally protected communication of ideas, opinions, or positions. These cases adopted either the reasoning or the exact language from a concurring opinion in *Wohl* that: "Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated." *Bakery & Pastry Drivers & Helpers Local v. Wohl, supra* at 776.

The important change brought about in the shape of this area of constitutional law flowed naturally after that reasoning. Participants in picketing during a labor-management dispute may not use otherwise legal picketing to accomplish an illegal object. The court decided in *Ritter's, Giboney, Hughes, Hanke, Gazzam,* and *Vogt,* that a state may impose regulation by way of enjoining picketing where the picketing was to accomplish an object declared to be illegal by laws or public policy of that state. *Ritter's* permitted a Texas court to enjoin secondary boycott type picketing, the object of which was in violation of the Texas "anti-trust law." *Hughes* approved an injunction against pickets which violated a California racial discrimination law. *Hanke* allowed an injunction to stand which prohibited the picketing against a sole proprietor, a class protected against union activity by the State of Washington. *Gazzam* refused to interfere with an injunction against pickets held to be coercive

against employees' choice of bargaining representative, contrary to Washington's state law and public policy. *Vogt* likewise approved of an injunction against picketing held by a Wisconsin court to have been a state unfair labor practice, coercing employers.

This Court has previously recognized these general boundaries of permissive regulation. They are well outlined in the language quoted by Judge Browning in *Ohio Valley Advertising Corporation v. Local 207, Sign Painters, A. F. of L.*, 138 W.Va. 355, 367-68, 76 S.E. 2d 113, 120:

> " 'The pattern which emerges to shape the boundaries of State action seems to be that picketing is subject to regulation by the State, either by legislation or by court action. But such regulation must have a reasonable basis in prevention of disorder, restraint of coercion, protection of life or property, or promotion of the general welfare. The instrument of State action, whether judicial process or legislative enactment, must be specifically directed to acts or conduct which overstep legal limits, and not include those which keep within the protected area of free speech.' " Quoting *Edwards, et al. v. Commonwealth*, 191 Va. 227, 60 S.E.2d 916.

There was no allegation in the complaint that the pickets violated any law or public policy of the State. Appellees inject, for the first time on appeal, that the picketing was in violation of Chapter 21, Article 1(a), Code, 1931, as amended (the West Virginia Labor Management Relations Act). Even if this argument had been timely presented in the lower court, it is clear that it has no application to this industrial dispute. Specifically excluded in the act are employers and employees who are subject to the jurisdiction of the NLRB. Chapter 21, Article 1(a), Sections 2(2) and 2(3), Code, 1931, as amended. The appellees admit doing $150,000. per year business in interstate commerce, well above the amount for the assumption of jurisdiction by the NLRB.

The record is devoid of any evidence that the pickets were in violation of any law or regulation of the State of West Virginia. They were completely peaceful and their number limited principally to two pickets at a time. Their efforts at communicating to others was described by the principal United Maintenance witness as "very polite." The picketing at United Maintenance, as all picketing must under the Federal decisions, contained elements other than communication. Nevertheless, it came as close as industrial picketing will ever come to being a "pure" free speech type of industrial picketing. Limited to this narrow set of facts, it is probable that the mere granting of a temporary injunction without a hearing was, in itself, a violation of the First and Fourteenth Amendments. *Carroll v. President and Commissioners of Princess Anne,* 393 U.S. 175. It is true that *Carroll* involved an injunction against holding a political meeting. The United States Supreme Court held in *Carroll* that such an injunction of a pure free speech function without an evidentiary hearing, was prohibited by the First Amendment.

The limited nature of the allegations in the complaint should have made it apparent to the special judge that an evidentiary hearing was necessary. Constitutional requirements aside, the court, at its hearing on the motion to dissolve, should have made findings of fact and conclusions of law. This is required by Rule 52 of the West Virginia Rules of Civil Procedure after trial on the complaint. Despite the language of Rule 52, a trial court should make similar findings and conclusions when ruling on a motion to dissolve an injunction of this type, to assist appellate courts in determining whether there is an area for legitimate state regulation by injunction.

It is not necessary to determine the case, however, on such narrow grounds. The injunction should have barred specific illegal acts, not legitimate communication of ideas. This Court said in *Ohio Valley Advertising Corporation v. Sign Painters, supra* at 368 (and we emphasize this requirement for injunctions of this type):

> "We do not consider it necessary to discuss in detail or determine whether the final decree of the trial court was too broad, and dealt in legal generalities rather than to specifically advise the parties of their rights under it, * * *. However, we do approve the statement contained in the opinion of the Supreme Court of the United States in *Milk Wagon Drivers Union v. Meadowmoor Dairies,* 1941, 312 U.S. 287, * * * to the effect that: 'In the exceptional cases, * * * the restraint ought to be defined by clear and guarded language. According to the best practice, a judge himself should draw the specific terms of such restraint and not rely upon drafts submitted by the parties.' "

It is obvious from the evidence, and the failure of the court to indicate otherwise, that both the picketing and the broad indiscriminate injunction against all picketing comprise very similar unconstitutional circumstances as those considered by the United States Supreme Court in *Thornhill v. Alabama, supra.* The picketing was not to accomplish an illegal purpose, nor was there any allegation of any illegal purpose. The blanket temporary injunction against such picketing clearly violated the defendant's First Amendment rights of free speech.

It is equally clear that the circuit court was without jurisdiction to grant the injunction against picketing. Congress has declared in the Labor Management Relations Act, 29 U.S.C., Section 153 et seq., that industrial disputes involving interstate commerce shall be under the jurisdiction of the National Labor Relations Board. When a dispute is subject to the NLRB jurisdiction, a state is preempted from acting to enforce private or public rights.

In interpreting a similar case in the State of Pennsylvania, where it was alleged that the Pennsylvania Labor Relations Act was violated, the court stated:

> "Congress has taken in hand this particular type of controversy where it affects interstate commerce. In language almost identical to parts of the Pennsylvania statute, it has forbidden

labor unions to exert certain types of coercion on employees through the medium of the employer. It is not necessary or appropriate for us to surmise how the National Labor Relations Board might have decided this controversy had petitioners presented it to that body. The power and duty of primary decision lies with the Board, not with us. * * *

"Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal * * *. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules * * * ." *Garner v. Teamsters Union,* 346 U.S. 485, 488-491.

See also *San Diego Building Trades Council, etc. v. Garmon,* 359 U.S. 236, 244-45:

"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, * * * state jurisdiction must yield. * * *

"At times it has not been clear whether the particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both of these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board. * * *

" * * * When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board * * * ."

See also *Motor Coach Employees v. Lockridge,* 403 U.S. 274.

Section 7 of the Labor Management Relations Act provides in pertinent part:

> "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, * * * ." Section 7, Labor Management Relations Act, 29 U.S.C., Section 157.

Section 8 of that Act provides in pertinent part:

> "It shall be an unfair labor practice for an employer:
>
> *   *   *
>
> "(5) to refuse to bargain collectively with the representatives of his employees, * * * ." Section 8(a)(5), Labor Management Relations Act, 29 U.S.C., Section 158(a)(5).

The union contends that under Section 7, regardless of the majority or minority status of the union, it has the right to picket for purposes of trying to organize a company for a period of thirty days under decisions of the National Labor Relations Board.

In the alternative, the union argues that it was an unfair labor practice under Section 8 when United Maintenance refused to bargain with them because they were a majority union, that is, that a majority of the United Maintenance employees belonged to the union. In the same vein, the union argues that United Maintenance is a successor employer to United Electric, and inasmuch as the union was a certified bargaining representative for United Electric, United Maintenance was required to bargain with the union under the doctrine announced by the United States Supreme Court in *National Labor Relations Board v. Burns International Security Services,* 406 U.S. 272.

There is, of course, an important difference between *Burns* and the instant case. In *Burns,* the successor corporation had already hired a majority of the former

company's union employees. United Maintenance had attempted unsuccessfully to hire a majority of United Electric's union employees, and may well have attempted to hire more, but was prevented from doing so by the presence of the pickets. Whether this is a *Burns* type successor situation could be interpreted one way or the other. It has not been interpreted by the Federal courts.

It is not necessary nor appropriate for us to decide the "successor corporation" issue, nor is it appropriate for us to decide the other issues concerning alleged unfair labor practice. We do decide that such issues exist, and thus deciding, that is all that is required to arguably make applicable Section 7 and Section 8 of the LMRA. The resolution of the issues themselves must be made initially by the National Labor Relations Board. *Garner v. Teamsters Union, supra; San Diego Building Trades Council, etc. v. Garmon, supra; Motor Coach Employees v. Lockridge, supra.*

Here again, this is not a case of first impression in this State. The question was directly decided in *McJunkin Corporation v. Bell Lines, Inc.,* 144 W.Va. 330, 341, 345, 108 S.E.2d 12, 18, 21, wherein this Court said:

> " * * * We do not say, of course, that the assumption * * * in every case constitutes a final determination of jurisdiction, but, as * * * in the *Weber* case, * * * 'The point is rather that the Board, and not the state court, is empowered to pass upon such issues in the first instance'.
>
> *                    *                    *
>
> " * * * the questions involved in this proceeding fall within the exclusive jurisdiction of the National Labor Relations Board, or, at least, that board has the exclusive jurisdiction to determine the questions in the first instance."

The union asks that we take judicial notice that the NLRB has specifically assumed jurisdiction in the case. As pointed out by appellee, NLRB action was taken after the injunction was granted, the motion to dissolve denied, and the appeal taken. However, in view of the obvious

application of the preemption doctrine, it is not necessary to decide this question.

Nor is it necessary, in view of the disposition of the principal contentions in the case, to consider other contentions advanced by the appellant; that there was no allegation of irreparable harm to United Maintenance; that the court failed to balance the equities of the parties; and that the court erred in other particulars.

In view of the foregoing, the action of the Circuit Court of Monongalia County is reversed, and the case is remanded with directions to dissolve the temporary injunction.

*Reversed and remanded*
*with directions.*