PRESTON B. GOODEN

*v.*

BOARD OF APPEALS OF THE WEST VIRGINIA

DEPARTMENT OF PUBLIC SAFETY, *etc., et al.,*

ROBERT L. BONAR, *superintendent, etc.*

(No. 13699)

Decided April 26, 1977.

*Kay, Casto & Chaney, George S. Sharp, John R. Hoblitzell,* for appellant.

*Franklin D. Cleckley, Ross Maruka,* for appellee.

CAPLAN, CHIEF JUSTICE:

Preston B. Gooden, prior to April 24, 1971, was a member in good standing of the Department of Public Safety of the State of West Virginia, having held the rank of Trooper. On April 23, 1971, Trooper Gooden made a speech in Morgantown, West Virginia before the combined Civic Clubs of Morgantown, which the Superintendent of the Department of Public Safety believed constituted violations of certain departmental regulations. Consequently, Trooper Gooden was discharged from his position with the department on April 24, 1971.

Trooper Gooden, appealing his discharge, pursued his administrative remedies and on February 13, 1974, after several intermittent proceedings, the Board of Appeals of the Department of Public Safety affirmed his dismissal. Upon appeal to the Circuit Court of Kanawha County, by an order of that court dated October 7, 1975, the ruling of the Board was reversed and Trooper Gooden was reinstated to his former position with the department with full payment of any compensation withheld and with full credit for service with the department from the date of his discharge. It is from that order that Robert L. Bonar, then Superintendent of the Department of Public Safety, prosecuted this appeal.

The speech alluded to above was doubtless critical of the administration of the Department of Public Safety and of its superintendent. Trooper Gooden made several specific charges, such as, that the "promotional system ... is geared to who you hunt and fish with or who you know rather than on merit"; that there exists a "system that permits an officer to associate with known racketeers and still reach a rank of leadership"; and, that the department reflects a "system that still has not learned that the professional police work and politics do not mix." Additionally, Gooden stated that he was prepared

to present proof that there was political interference with certain criminal investigations, to the extent that he and other law enforcement officers were asked to lie in support of statements made by the department's "leader" and the executive administrator of the governor. At the conclusion of his speech, Gooden called for his audience to support an investigation of the Department of Public Safety.

As noted, the day following his speech, Gooden was discharged. Subsequently, Superintendent Bonar filed a Specification of Charges with the Board of Appeals wherein he charged that Gooden's conduct constituted insubordination and specifically charged violations of Paragraphs 4, 5 and 7 of General Order No. 14. He further charged that Gooden refused to obey an order of a superior officer in violation of Chapter 15, Article 2, Section 19 of the *West Virginia Code*.

The circuit court, upon consideration of the matters appealed, held that *W. Va. Code*, 1931, 15-2-19, as amended, was constitutional. It found, however, and ruled that Paragraphs 4, 5 and 7 of General Order No. 14 were unconstitutional. It held that such regulations, being vague and overbroad were generative of a chilling effect on constitutionally protected areas of speech and were therefore violative of the First and Fourteenth Amendments to the Constitution of the United States. We affirm the rulings of the Circuit Court of Kanawha County.

Upon this appeal the appellant, in his brief, assigns error as follows:

"The Court erred in holding that paragraphs 4, 5 and 7 of the Department of Public Safety's General Order No. 14 violates the First and Fourteenth Amendments to the United States Constitution by reason of being vague and overbroad and thus productive of a chilling effect upon Preston Gooden's right of free speech."

By reason of our decision on the above assignment it is unnecessary to discuss or decide the issue raised by the

second assignment of error—whether the Board's findings conformed to the requirements of *W. Va. Code*, 29A-5-3, as amended.

Preliminarily, the appellant charges that Preston Gooden lacks standing to challenge the subject regulations for vagueness and overbreadth. Appellant Bonar relies principally on *Young v. American Mini Theatres*, ____ U. S. ____, 96 S. Ct. ____, 49 L. Ed. 310 (1976). In that case operators of adult movie theaters sought to test the constitutionality of licensing and zoning ordinances designed to restrict the location of theaters where "adult" movies were exhibited.

In *Young* the theater operators claim that the ordinances are too vague. While they do not attack the definition of "Specified Sexual Activities" or "Specified Anatomical Areas," they argue that they "cannot determine how much of the described activity may be permissible before the exhibition is 'characterized by an emphasis' on such matter." Also, they complain that no procedures were set out for obtaining a waiver of the 1000 foot restriction. The court said that by their own admission the ordinances "are unquestionably applicable to these respondents"; furthermore, neither operator has alleged any basis for claiming or anticipating any waiver.

The court held that this would be an inappropriate case to apply the principle urged by the operators that they be permitted to challenge the ordinances, not because their own rights of free expression are violated, but because the rights of others not before the court may be affected. Basically, the court said that since there is no uncertainty about the impact of the ordinances on the rights of the theater operators, the deterrent effect thereof on legitimate expression is not "both real and substantial" and, since the ordinances are "readily subject to a narrowing construction by the state courts", they will not be permitted to assert the rights of third parties.

The *Young* decision, being based on an entirely different factual situation, is inapposite here. The challenge to the regulations in the instant case is made on the

grounds of vagueness and overbreadth. Appellee Gooden here asserts a violation of his own rights as well as those of other members of the Department of Public Safety. General Order No. 14 applied to Gooden and to all members of the department. If it has a deterrent effect on legitimate expression, and we believe that it does, such effect is "both real and substantial." *See, Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975). Furthermore, there is no manner in which the regulations are "readily subject to a narrowing construction by the state courts." The real and substantial deterrent effect of the regulations is readily demonstrated when you consider that thereunder a member of the department cannot publicly speak without obtaining permission from the superintendent. Appellee Gooden is a member of the group at which the subject regulations are directed and, as such, his right to speak is subject to curtailment by such regulations. This alone is sufficient to establish his standing to challenge the regulations. We are of the firm opinion and hold that appellee Gooden has standing to challenge the constitutionality of the subject regulations for vagueness and overbreadth. *See, N.A.A.C.P. v. Button*, 371 U.S. 415 (1963) and *Muller v. Conlisk*, 429 F.2d 901 (7th Cir. 1970).

We come now to the merits of this appeal—whether the trial court erred in holding paragraphs 4, 5 and 7 of General Order No. 14 violative of the First and Fourteenth Amendments to the United States Constitution by reason of being vague and overbroad. Those paragraphs read as follows:

"4. No member shall for any reason whatsoever use threatening, abusive or insulting language or otherwise behave in an insubordinate or disrespectful manner toward any officer, non-commissioned officer or fellow member of the Department.

"5. No member shall speak disrespectfully of or ridicule any member of the Department, nor shall he publicly criticize any member of the Department.

"7. All business of the Department is confidential. Members will not disclose such business to anyone, except to those who may be entitled to such information, or as directed by the Superintendent or Company Commander. Members of the Department will not give out interviews or make public speeches concerning the policies of the Department without permission from the Superintendent."

Upon careful examination of the language contained in the above quoted regulations we are in agreement with the holding of the learned trial judge who found them to be vague beyond constitutional permissibility. The test of "vagueness" in the context of a statute or regulation designed to punish or discipline, is whether a person of ordinary intelligence is given fair notice that his contemplated conduct is prohibited by such statute or regulation. *State v. Flinn*, ___ W. Va. ___, 208 S.E.2d 538 (1974). This rule reflects the common law and has, by the Supreme Court of the United States, been molded into "a rule of constitutional law, holding that such definiteness is necessary to satisfy the due process requirements of the Fourteenth Amendment." *State v. Flinn, supra.*

One of the leading cases reflecting our view that the subject regulations are overbroad and thus an unconstitutional restraint on Gooden's right of free speech is *Pickering v. Board of Education*, 391 U.S. 563 (1968). In that landmark decision the court spoke succinctly and forcefully held that public employees, though subject to reasonable regulations, do not forfeit their rights to the protection of the First Amendment relating to freedom of speech.

In that case, Pickering, a public school teacher, was dismissed from his position for sending a letter to a local newspaper in which he criticized the Board of Education and the district superintendent of schools for their handling of proposals to raise new revenues for the schools. Pickering's claim that his writing of the letter was protected by the First and Fourteenth Amendments was

rejected by the Illinois Supreme Court. In the above cited case, however, the decision of the Illinois court was reversed.

In *Pickering v. Board of Education, supra,* the basic holding of the court is reflected in the following language: "statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors." Quoting from *Keyishian v. Board of Regents,* 385 U.S. 589 (1967), the court said: " '[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.' " The court in *Pickering* then used this significant language:

> "At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

The thrust of this well reasoned decision is that public employees are entitled to the protections afforded by the First and Fourteenth Amendments and any regulations pertaining to such employees must recognize such rights and strike a balance between the interests of such employee, as a citizen commenting on matters of public concern, and the interest of the state in promoting efficiency in its affairs.

In *Muller v. Conlisk,* 429 F.2d 901 (7th Cir. 1970), the court held that a police department rule prohibiting policemen from engaging in "any activity, conversation, deliberation, or discussion which is derogatory to the Department" was overbroad and constitutionally impermissible. We adhere to the principles expressed therein.

That case involved disciplinary action taken against a detective employed by the City of Chicago Police Department for the alleged violation of the above departmental rule. Muller, the detective alluded to, discovered corruption in the police department and reported it to his commanding officer. When no action was taken, Muller, in a television interview, made certain statements for which he was orally reprimanded. When he was asked, during the interview, why he had not gone to the Police Department's Internal Inspection Division with his charges, he replied: "The IDD is like a great big washing machine. Everything they put into it comes out clean."

In holding the rule, under which Muller was reprimanded, overbroad and invalid, the court said:

> "In the instant case, Rule 31 stands as a 'threat of sanctions' intended to inhibit the right of policemen to speak as freely as other citizens on matters of public concern. If, as alleged, it sweeps too broadly, it has the effect of inhibiting constitutionally protected speech.
>
> . . .
>
> "We think it clear beyond dispute that the rule is overbroad. In substance, it prohibits all criticism by policemen of the department. It may no longer be seriously asserted that public employees, including policemen, have no right to criticize their employer.
>
> " 'Policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights.' " (quoting from *Garrity v. New Jersey*, 385 U.S. 493 (1967)).

The defendants, in *Muller*, devoted the major portion of its brief to distinguishing *Pickering v. Board of Education, supra*, by emphasizing that "policemen are different than teachers and that police departments are quasi-military forces dependent upon rigid internal discipline for their effectiveness." The court disagreed, saying that the balance which Pickering says must be struck applies equally here. In effect, the court then concluded that the unique characteristics of police em-

ployment warrants some limitation of rights but they must not be destroyed.

There are many similarities between the court-rejected Rule 31 in *Muller* and the regulations in the instant case. In each case the policeman was prohibited from engaging in any activity which, in any way, was critical of the department. In each case both protected and unprotected speech were prohibited by the plain meaning of the regulatory language. In the instant case as well as in *Muller* the prohibitions against free speech were broader than necessary for the protection of the department. In *Muller* the court struckdown such regulations as being overbroad. In the instant case we likewise declare constitutionally impermissible paragraphs 4, 5 and 7 of General Order No. 14.

In *Flynn v. Giarrusso*, 321 F. Supp. 1295 (E.D. La.1971), Flynn, a lieutenant of the New Orleans Police Department, was suspended from the force for writing an article entitled "Who's Shaking the Political Plum Tree?????". This article was critical of the police administration. In that case Flynn sought and was awarded injunctive relief. Citing *Pickering v. Board of Education, supra; Muller v. Conlisk, supra* and *Keyishian v. Board of Regents, supra,* and employing language and principles similar to those used in those cases, the court declared the regulation which Flynn allegedly violated unconstitutional for vagueness and overbreadth.

Applying the principles expressed in the foregoing authorities to the instant case we find the subject regulations overbroad and vague. As heretofore indicated, our holding does not preclude the imposition of regulations on members of the department; in so doing, however, it is imperative, in fact, it is mandated by the First and Fourteenth Amendments that such regulations establish a proper balance between the policeman as a citizen with a guaranteed right to comment on matters of public concern and the Department of Public Safety, as an employer, in promoting the efficiency of the public services it performs.

We are of the opinion that the overbreadth of the subject regulations created such an imbalance between the rights of Trooper Gooden and the needs of the department in operating efficiently, that Gooden's freedom of speech was unconstitutionally restricted.

The judgment of the Circuit Court of Kanawha County is affirmed.

*Affirmed.*

MILLER, JUSTICE, *concurring*:

I concur in the result and the excellent opinion that reaches it. My only departure from the majority is I believe we should, whenever possible, tie our constitutional guarantees to our *State Constitution.*

The majority finds that certain paragraphs of General Order No. 14 are unconstitutional as violating the First Amendment to the *Constitution of the United States,* specifically, the prohibition against abridging the freedom of speech. A similar prohibition is found in Article III, Section 7 of the *West Virginia Constitution.* As a matter of fact, substantially all of the provisions of the Bill of Rights found in the first ten Amendments of the *United States Constitution* are to be found in Article III of the *West Virginia Constitution.* There is not an exact parallel of language in all instances, but a careful comparison between the language of these basic constitutional guarantees leads me to conclude that we have, in some instances, superior language in our *State Constitution.*

First Amendment rights are incorporated in Article III, Sections 7, 15 and 16 of our *Constitution.* The Second Amendment on the right to bear arms has no counterpart in our *Constitution.* The Third Amendment on quartering of soldiers is parallel to Article III, Section 12. The Fourth Amendment on unreasonable searches is found in Article III, Section 6. The Fifth Amendment, involving due process, etc., is set out in Article III, Sections 5 and 10. The Sixth Amendment relative to a

speedy trial and other criminal procedural rights is encompassed in Article III, Section 14. The Seventh Amendment regarding the right to trial by jury in civil cases is contained in Article III, Section 13. The Eighth Amendment rights prohibiting excessive bail and fines can be found in Section 5 of Article III. The provisions of the Ninth and Tenth Amendments are found in Article III, Sections 2 and 3.[1]

The United States Supreme Court has recognized that a State has the freedom to set the level of its own constitutional guarantees, and they will not be overturned provided they are not below the federal standards.[2] We have seen in recent years the United States Supreme Court pendulate on its interpretation of the Bill of Rights. To me, it seems preferable to fashion our concepts based upon our Constitution, in the hope these rights will become more permanent.

I am authorized to say that Justice Neely joins with me in this concurring opinion.

---

[1] The requirement of "equal protection" under the law required by the Fourteenth Amendment and made obligatory on the States is found in Article III, Section 17. It is interesting to note that the "equal protection" prohibition on the federal government is not specifically stated in the Bill of Rights, but arises by implication out of the Fifth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 98 L. Ed. 884, 74 S.Ct. 693 (1954); *see Johnson v. Robison*, 415 U.S. 361, 39 L. Ed. 2d 389, 94 S.Ct. 1160 (1974); *Richardson v. Belcher*, 404 U.S. 78, 81, 30 L. Ed. 2d 231, 92 S.Ct. 254 (1971).

[2] *See, Oregon v. Hass*, 420 U.S. 714, 43 L. Ed. 2d 570, 95 S.Ct. 1215 (1975); *Sibron v. New York*, 392 U.S. 40, 60-61, (1968).