319 S.E.2d 372

**Tom WOODRUFF, et als.**

v.

**BOARD OF TRUSTEES OF CABELL HUNTINGTON HOSPITAL, etc., et als.**

**No. 16313.**

Supreme Court of Appeals of West Virginia.

July 11, 1984.

Grant Crandall and Bradley J. Pyles, Crandall, Pyles & Crandall, Charleston, for petitioners.

William C. Beatty and Richard J. Bolen, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, for respondents.

McGRAW, Justice:

The petitioners in this original proceeding in mandamus are fourteen former employees of Cabell Huntington Hospital, and their union district president, Tom Woodruff. The respondents are the Board of Trustees of Cabell Huntington Hospital;

its acting president, Stephen E. Shride; and its vice-president, Walter M. Jacob.

The petitioner employees seek reinstatement after they were discharged for distributing leaflets on and near the hospital premises. This request for extraordinary relief is based upon the petitioner employees' contention that their activities were protected exercises of free speech rights guaranteed under the state and federal constitutions.

On April 16, 1984, the respondent Board of Trustees announced its decision to eliminate forty-three positions at the hospital. The union representing a substantial number of the employees at the hospital, including thirty-nine of those whose positions were to be eliminated, publicly disputed the necessity of the proposed job eliminations. The union, and its members, utilized various public forums for the expression of their views on this issue. The respondents state that any retaliatory action taken against the petitioners was not in response to these activities. On May 9–13, 1984, however, the petitioners participated in the group distribution of leaflets on and near the hospital premises. The respondents state that the petitioners were discharged for participating in this group distribution. Although the respondents complain that negative comments concerning hospital management were made by those participating in this group distribution of leaflets; that some nonunion personnel felt inconvenienced by the petitioners' activity; and that there was some littering in connection with the distribution of leaflets, there is no indication that this distribution was anything but peaceful.[1] Additionally, there is nothing in the record, beyond the respondents' bald allegations to the contrary, which indicates that the normal operations of the hospital were, in any way, adversely affected by the group distribution of leaflets.

Nevertheless, on May 11, 1984, respondent Jacob issued a memorandum to the union which characterized the group distribution of leaflets on and near the hospital premises as a violation of a collective bargaining agreement provision which prohibited "picketing or patrolling." On May 12, 1984, nine hospital employees, with a total of eighty-four years' experience at the hospital, were terminated for the distribution of leaflets. On May 14, 1984, five other hospital employees, with a total of forty-six years' experience at the hospital, were also terminated for the continued distribution of leaflets. Among the petitioners discharged were all of the local union officials and every hospital employee who was a union district official. The respondents contend, however, that no attempt was made to single out union officers for discipline.

On May 14, 1984, the eight hospital employees initially discharged, along with the president of their union district, filed a petition for a writ of mandamus against the respondents. A rule to show cause was issued by this Court against the respondents on May 15, 1984, made returnable on May 22, 1984. On May 17, 1984, a supplement to the petitioners' request for a writ of mandamus was filed, requesting the addition of the five employees discharged on May 14, 1984. On May 30, 1984, this Court entered an order which reinstated these fourteen hospital employees with

---

1. The respondents do indicate that an altercation took place on May 14, 1984, between a nonemployee union representative and two hospital security personnel after the union representative attempted to gain access to the hospital cafeteria. This incident, however, was unrelated to the leafletting activities of the employees. It is worth noting with respect to violence which takes place in the industrial setting that judicial remedies are available to prevent its recurrence. For example, in Syllabus Point 1 of *United Maintenance and Manufacturing Co., Inc. v. United Steelworkers of America*, 157 W.Va. 788, 204 S.E.2d 76 (1974), this Court held that:

> Where jurisdiction over a labor dispute has not been preempted by National Labor Relations Board jurisdiction, a state may regulate picketing by injunction if the injunction has a reasonable basis in prevention of disorder, protection of life or property, or promotion of the general welfare as defined by state law; however, such injunction must be specifically directed to acts or conduct which are designed to accomplish an illegal purpose, and not include those which keep within the protected area of free speech.

Furthermore, our criminal laws provide a mechanism through which relief may be obtained for specific acts of violent conduct.

back pay, noting that a more comprehensive opinion supporting our order would follow. The primary issue presented in this action is whether the disciplinary actions taken by the hospital in response to the group distribution of leaflets by the fourteen hospital employees violated their free speech rights under the federal and state constitutions.

## I.

■ A threshold issue we must first address prior to our discussion of the free speech issue, however, is whether extraordinary relief is appropriate in this case.[2] It is well established in this jurisdiction that "A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of the respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." Syl. pt. 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969); *see also Reed v. Hansbarger*, 173 W.Va. 258, 314 S.E.2d 616, 619–20 (1984), and cases cited therein.

The first two elements of this formula require an inquiry into the respective legal rights and duties of the parties, and there-

fore will be addressed in our discussion of the free speech issue. As to the third element, the respondents strongly suggest that a grievance and arbitration clause in the collective bargaining agreement does provide the sole and exclusive remedy for the petitioners to challenge their terminations. Although it is true that article XXIV of the collective bargaining agreement provides that "Any such employee who feels that he or she has been unjustly disciplined, suspended or discharged, and who desires to contest the discipline, suspension, or discharge shall follow and be bound by the procedures set forth in Article XXIII Grievance and Arbitration established for the processing of Employee Grievances," the petitioners were discharged pursuant to article XXV of the collective bargaining agreement, which provides in section 1 that: "During the term of this agreement, the grievance and arbitration machinery of this agreement *and the administrative and judicial remedies and procedures provided by law* shall be the sole and exclusive means of settling any employee and/or Union grievance with the Hospital, or any other type of dispute . . ." (Emphasis added). Therefore, by the terms of the collective bargaining agreement, the grievance and arbitration procedure contained therein is not the sole and

2. Although not raised by either side in this case, two other preliminary issues which should be addressed are federal preemption under the Labor Management Relations Act, 29 U.S.C. §§ 141–187 (1982), and the applicability of the West Virginia Labor-Management Relations Act, West Virginia Code § 21–1A–1–8 (1981 Replacement Vol.).

As noted by this Court in *United Maintenance and Manufacturing Co., Inc. v. United Steelworkers of America*, 157 W.Va. at 798, 204 S.E.2d at 83: "When a dispute is subject to NLRB jurisdiction, a state is preempted from acting to enforce private or public rights." The statutory definition of "employers" covered under the federal Labor Management Relations Act (LMRA) expressly excludes "any State or political subdivision." 29 U.S.C. § 152(2) (1982). As the respondents correctly note, Cabell Huntington Hospital is a public, nonprofit governmental corporation created by and existing under the authority of the West Virginia Legislature. Furthermore, its administration and management is vested by statute in a board of trustees appointed by the county commission. *See* West Virginia Code § 7–3–15 (1984 Replacement Vol.). It

qualifies as a political subdivision exempt from application of the LMRA and the primary jurisdiction of the National Labor Relations Board. *See City of Fairmont v. Retail, Wholesale, and Department Store Union, AFL–CIO*, 166 W.Va. 1, 283 S.E.2d 589, 592 n. 3 (1980).

Similarly, under the West Virginia Labor-Management Relations Act, the definition of the term "employer," as covered under the act, expressly excludes "the State of West Virginia or any political subdivision or agency thereof." West Virginia Code § 21–1A–2(a)(2) (1981 Replacement Vol.). Additionally, "any corporation or association operating a hospital, if no past part of the net earnings inures to the benefit of any private shareholder or individual," is expressly excluded from the statute's definition of "employer." West Virginia Code § 21–1A–2(a)(2) (1981 Replacement Vol.). Under either of these definitions, Cabell Huntington Hospital is exempt from application of the West Virginia Labor-Management Relations Act. *See City of Fairmont v. Retail, Wholesale, and Department Store Union, AFL–CIO*, 166 W.Va. at 6 n. 3, 283 S.E.2d at 592 n. 3.

exclusive avenue of relief in all disputes arising under the agreement, particularly with regard to grievances arising under the agreement's "no strike" provision.[3]

 We recognize, as we have in the past, that "While it is true that mandamus is not available where another specific and adequate remedy exists, if such other remedy is not equally as beneficial, convenient, and effective, mandamus will lie." Syl. pt. 4, *Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781 (1981); *United Mine Workers of America v. Miller*, 170 W.Va. 177, 291 S.E.2d 673, 677 (1982). Because of the importance of the constitutional issues raised in this case, and because it is apparent that the respondents have continued to take retaliatory action against the continued distribution of leaflets, the grievance and arbitration procedure under the collective bargaining agreement is not equally as beneficial, convenient or effective as is extraordinary relief in this case.

## II.

The Cabell Huntington Hospital is a public institution, created by an act of the Legislature in 1945. *See* 1945 W.Va. Acts ch. 157, *as amended,* 1947 W.Va. Acts ch. 166. Its construction was financed through bonds approved by the voters of Cabell County and the city of Huntington. *See* 1953 W.Va. Acts ch. 183. Its administration and management is vested by statute in a board of trustees appointed by the county commission. West Virginia Code § 7–3–15 (1984 Replacement Vol.). Additionally, the Legislature provided in 1953 that "the title to all property constituting or belonging to the hospital shall be vested jointly in the county court and the city of Huntington." 1953 W.Va. Acts ch. 183. Finally, in 1980, the Legislature authorized the issuance of revenue bonds to finance the construction and purchase of "additions, betterments, enlargements, exten-

**3.** Although, as previously noted, federal labor law is inapplicable in this case, even under federal law, in the absence of a *binding* arbitration clause, there is no duty to arbitrate. For example, in *Independent Oil Workers v. Mobile Oil Corp.,* 441 F.2d 651 (3d Cir.1971), the court was confronted, as in this case, with two conflicting arbitration provisions. The first provided that "Disputes ... as to the interpretation of or an alleged violation of the application of the terms and provisions of this Agreement, as written, *shall* first be processed through the Grievance Procedure ... [and] ... if not settled by the Grievance Procedure, *shall* be submitted to arbitration ...." (Emphasis added). 441 F.2d at 652 n. 3. The second provided that "Nothing in this agreement shall prevent either Company or Union ... from applying, during the term of this agreement to a court of competent jurisdiction for the relief to which such party may be entitled ...." 441 F.2d at 652 n. 3. In resolving this conflict, the court stated:

> While we are bound by and in agreement with the holding of the *Steelworkers Trilogy* [*United Steelworkers of America v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior and Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corporation,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)] that arbitration is to be encouraged and that "doubts should be resolved in favor of coverage" in interpreting collective bargaining agreements, nevertheless we cannot disregard another statement in one of

those cases holding, "... arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." [*Warrior and Gulf Navigation Co.,* 363 U.S. at 582, 80 S.Ct. at 1353, 4 L.Ed.2d at 1417].

441 F.2d at 653. Therefore, the court held that the second clause providing that "Nothing in this agreement shall prevent ...," was "an 'escape' clause which nullifies the mandatory terms of the earlier language and makes arbitration optional." 441 F.2d at 654.

Similarly, under West Virginia law, there is no duty to arbitrate in the absence of a binding arbitration clause. In Syllabus Point 1 of *Board of Education v. W. Harley Miller, Inc.,* 160 W.Va. 473, 236 S.E.2d 439 (1977), this Court stated:

> Where parties to a contract agree to arbitrate either all disputes, or particular limited disputes arising under the contract, and where the parties bargained for the arbitration provision, such provision is binding, and specifically enforceable, and all causes of action arising under the contract which by the contract terms are made arbitrable are merged, in the absence of fraud, into the award of the arbitrators.

*See also* Syl. pt. 1, *Barber v. Union Carbide Corp.,* 172 W.Va. 199, 304 S.E.2d 353 (1983); Syl. pt. 1, *Baker Mine Service, Inc. v. Nutter,* 171 W.Va. 770, 301 S.E.2d 860 (1983); Syl. pt. 1, *State ex rel. Ranger Fuel Corp. v. Lilly,* 165 W.Va. 98, 267 S.E.2d 435 (1980). Because of the "escape" clause in the collective bargaining agreement involved in this case, the grievance and arbitration procedure contained therein is merely optional, and does not preclude judicial intervention.

sions and improvements to and equipment and furnishing for" the hospital. 1980 W.Va. Acts ch. 131. As a public institution, it is subject to the limitations imposed by free speech rights guaranteed its employees under the federal and state constitutions.

Article XXV, § 1 of the collective bargaining agreement between the union and the hospital provides, in pertinent part, that:

> neither the Union nor the employees or any of them will instigate, cause, encourage, promote, sponsor, lend aid to, sanction, engage in or condone any strike, slowdown in any facility of the Hospital or any curtailment of work or restriction of production of the Hospital or any picketing or patrolling during the term of this agreement.

Section 4 of article XXV further provides that "The Hospital shall have the right to ... discharge any employee who violates Section 1 of this Article." The termination actions taken by the hospital were made pursuant to these two contract provisions.

■ The United States Supreme Court has long held that public employees may not "be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public [institutions] in which they work." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811, 817 (1968). *See also Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708, 716 (1983); *Branti v. Finkel*, 445 U.S. 507, 515–16, 100 S.Ct. 1287, 1293, 63 L.Ed.2d 574, 582–83 (1980); *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570, 577 (1972); *Keyishian v. Board of Regents*, 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967). Similarly, in *Gooden v. Board of Appeals of the West Virginia Department of Public Safety*, 160 W.Va. 318, 324, 234 S.E.2d 893, 897 (1977), this Court stated that:

> public employees are entitled to the protections afforded by the First and Fourteenth Amendments and any regulations

pertaining to such employees must strike a balance between the interests of such employee, as a citizen commenting on matters of public concern, and the interest of the state in promoting efficiency in its affairs.

■ Unquestionably, the distribution of leaflets is an activity protected under constitutional free speech guarantees. In *Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 83 L.Ed. 949, 954 (1938), Chief Justice Hughes, writing for a unanimous Court, observed, "The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history attest." Since *Lovell*, the United States Supreme Court has continued its staunch protection of the right of citizens to distribute leaflets and other printed matter. *See United States v. Grace*, 461 U.S. 171, 176–177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736, 742 (1983); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1, 5 (1971); *Martin v. City of Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313, 1316–17 (1943); *Jamison v. Texas*, 318 U.S. 413, 416, 63 S.Ct. 669, 672, 84 L.Ed. 869, 872–73 (1943); *Schneider v. State*, 308 U.S. 147, 164, 60 S.Ct. 146, 152, 84 L.Ed. 155, 166 (1939).

■ Similarly, the *group* distribution of leaflets is an activity protected under constitutional free speech guarantees. Article III, § 16 of the West Virginia Constitution provides that "The right of people to assemble in a peaceable manner, to consult for the common good, to instruct their representatives, or to apply for redress of grievances, shall be held inviolate." The protections inherent and explicit in this state constitutional provision parallel associational, assemblage, and petition protections found under the first amendment. Under the federal constitution, the United States Supreme Court has consistently held that as long as an assemblage for expressive activity is peaceful, and no violence is

advocated, it is protected under the first amendment. *See, e.g., NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 915–20, 102 S.Ct. 3409, 3427–30, 73 L.Ed.2d 1215, 1237–41 (1982); *Coates v. Cincinnati*, 402 U.S. 611, 615–16, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214, 218 (1971); *Bachellar v. Maryland*, 397 U.S. 564, 567, 90 S.Ct. 1312, 1314, 25 L.Ed.2d 570, 573–74 (1970); *Shuttlesworth v. Birmingham*, 394 U.S. 147, 152–53, 89 S.Ct. 935, 939–40, 22 L.Ed.2d 162, 168 (1969); *Gregory v. Chicago*, 394 U.S. 111, 112, 89 S.Ct. 946, 947, 22 L.Ed.2d 134, 136 (1969); *Brown v. Louisiana*, 383 U.S. 131, 142, 86 S.Ct. 719, 724, 15 L.Ed.2d 637, 645 (1966); *Cox v. Louisiana*, 379 U.S. 536, 551–52, 85 S.Ct. 453, 462–63, 13 L.Ed.2d 471, 482 (1965); *Henry v. City of Rock Hill*, 376 U.S. 776, 777–78, 84 S.Ct. 1042, 1043, 12 L.Ed.2d 79, 81 (1964); *Edwards v. South Carolina*, 372 U.S. 229, 235–36, 83 S.Ct. 680, 683–84, 9 L.Ed.2d 697, 702 (1963); *Thomas v. Collins*, 323 U.S. 516, 530–32, 65 S.Ct. 315, 327, 89 L.Ed. 430, 440 (1945); *Hague v. CIO*, 307 U.S. 496, 513, 59 S.Ct. 954, 963, 83 L.Ed. 1423, 1435 (1939); *DeJonge v. Oregon*, 299 U.S. 353, 364–65, 57 S.Ct. 255, 260, 81 L.Ed. 278, 283–84 (1937); *United States v. Cruikshank*, 92 U.S. 542, 552, 23 L.Ed. 588, 591 (1876). Furthermore, when expressive activity is directed toward a public employer by public employees, the right to petition government for a redress of grievances is implicated. This right, as we stated in *Webb v. Fury*, 167 W.Va. 434, 282 S.E.2d 28, 34 (1981), *quoting Stern v. United States Gypsum, Inc.*, 547 F.2d 1329, 1342 (7th Cir.1977), *cert. denied*, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467, is " 'among the most precious of the liberties of safeguarded by the Bill of Rights.' *United Mine Workers of America, District 12 v. Illinois State Bar Association*, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967)."

▇▇▇ The fact that the leaflets distributed by the petitioners in this mandamus action may have touched upon issues concerning the relationship between the hospital and the union is insignificant. As the United States Supreme Court stated in *United Mine Workers of America v. Illinois State Bar Association*, 389 U.S. at 223, 88 S.Ct. at 356, 19 L.Ed.2d at 431 (1967), *quoting Thomas v. Collins, supra*, "the First Amendment does not protect speech and assembly only to the extent it can be characterized as political. 'Great secular causes, with small ones, are guarded.' " Additionally, as the Court stated in *Thornhill v. Alabama*, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093, 1102 (1940), "the dissemination of information concerning the facts of a labor dispute must be regarded as within the area of free discussion that is guaranteed by the Constitution." *See also City of Fairmont v. Retail, Wholesale, and Department Store Union, AFL–CIO*, 166 W.Va. 8–9, 283 S.E.2d at 593; Syl. pt. 2, *United Maintenance and Manufacturing Co. v. United Steelworkers of America, supra*; *Ohio Valley Advertising Corp. v. Union Local 207, Sign Painting, AFL*, 138 W.Va. 355, 367, 76 S.E.2d 113, 120 (1953); *Blossom Dairy Co. v. International Brotherhood of Teamsters*, 125 W.Va. 165, 172, 23 S.E.2d 645, 650 (1942). Finally, the litigants note that the petitioners' speech was not addressed solely to disputes between the hospital and the union, but also to the effect of the proposed job eliminations on the level of public health care, a decidedly public issue. In *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125, 132–33 (1964), the United States Supreme Court stated, "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." The Court has also stated that speech on public issues occupies the "highest rung of the hierarchy of First Amendment values." *NAACP v. Claiborne Hardware Co.*, 458 U.S. at 913, 102 S.Ct. at 3426, 73 L.Ed.2d at 1236 (1982); *Carey v. Brown*, 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263, 273 (1980). Given the unique nature of public employment, particularly in an area such as health care, it is readily apparent that conflicts which would have no political connotations in the private employment context may have many political connotations in the public employment context. The importance of petitioners' ex-

ercise of their free speech rights is not diminished by their admittedly mixed motives.

Because the collective bargaining agreement in question contains a provision prohibiting picketing and patrolling by hospital union members, the issue of waiver of free speech rights is raised. First, waiver of free speech, assembly, association, and petition rights under the West Virginia Constitution will be addressed. Second, waiver of first amendment rights under the federal constitution will be examined.

Article III, § 1 of the West Virginia Constitution provides that:

All men are, by nature, equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity, namely: the enjoyment of life and liberty, with the means of acquiring and possessing property, and of pursuing and obtaining happiness and safety.

These inherent rights, of which members of society may not by contract divest themselves, include the freedoms of speech and press under article III, § 7 of the West Virginia Constitution, and the rights to assemble, associate, and petition under article III, § 16 of the West Virginia Constitution. No parallel provision to this section of our state constitution appears in the United States Constitution. Therefore, with respect to the waiver of fundamental constitutional rights, our state constitution is more stringent in its limitation on waiver than is the federal constitution. We therefore hold that, under article III, §§ 1, 7, and 16 of the West Virginia Constitution, collective bargaining agreements in the public sector may not contain provisions abrogating employees' fundamental constitutional rights, including rights of expression, assembly, association, and petition. The petitioner employees' activities in the present case were unquestionably exercises of all four of these fundamental constitutional rights. We therefore conclude that the respondents' termination of the petitioner employees violated their fundamental constitutional rights under article III, §§ 1, 7, and 16 of the West Virginia Constitution.

### III.

In addition to the violation of the petitioner employees' fundamental constitutional rights under the state constitution, we also conclude that their termination violated their first amendment rights under the federal constitution. In *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the United States Supreme Court set forth an approach for evaluating claims of waiver of free speech rights. After noting that the right of free speech is the " 'matrix, the indispensable condition, of nearly every other form of freedom,' " the Court stated, "[w]here the ultimate effect of sustaining a claim of waiver might be an imposition on that valued freedom, we are unwilling to find waiver in circumstances which fall short of being clear and compelling." 388 U.S. at 145, 87 S.Ct. at 1986, 198 L.Ed.2d at 1105, *quoting Palko v. Connecticut*, 302 U.S. 319, 327, 58 S.Ct. 149, 152, 82 L.Ed. 288, 293 (1937), *overruled on other grounds, Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707, 716 (1969). This "clear and compelling" test for determining the existence of waiver in the free speech context has been applied in a number of cases. *See, e.g., United Automobile, Aerospace, Agricultural and Implement Workers of America v. Dana Corporation*, 679 F.2d 634, 646 (6th Cir.1982); *Sambo's Restaurants, Inc. v. City of Ann Arbor*, 663 F.2d 686, 690 (6th Cir.1981); *National Polymer Products, Inc. v. Borg-Warner Corp.*, 641 F.2d 418, 423 (6th Cir.1981); *In re Halkin*, 598 F.2d 176, 189 (D.C.Cir.1979); *Rodgers v. United States Steel Corp.*, 536 F.2d 1001, 1007 n. 14 (3d Cir.1976); *In re C.B.S., Inc.*, 570 F.Supp. 578, 584 (E.D.La.1983). Similarly, in *Consolidation Coal Company v. United Mine Workers of America*, 537 F.2d 1226, 1230 (4th Cir.1976), the court, in overturning the award of a preliminary injunction which prohibited picketing activities, stated that "words of greater specificity are required to indicate waiver

of a right specifically protected by the First Amendment."

As previously noted, the collective bargaining agreement between the hospital and the union in this case prohibited "picketing or patrolling." There is no mention in the agreement of either "leafletting" or "handbilling." In *Thornhill v. Alabama*, 310 U.S. at 100–01, 60 S.Ct. at 743, 84 L.Ed. at 1101, the United States Supreme Court recognized the "vague contours of the term 'picket.'" We also recognize the equally vague contours of the term "patrol." The terms "picketing" and "patrolling" are not defined anywhere in the agreement, nor do the respondents indicate any authoritative definitions of these terms as used in the labor relations context.

The United States Supreme Court has recognized that the practical effects of picketing versus the practical effects of the distribution of leaflets are quite different. In *Hughes v. Superior Court*, 339 U.S. 460, 465, 70 S.Ct. 718, 721, 94 L.Ed. 985, 992 (1950), Justice Frankfurter, writing for a unanimous Court, stated:

> Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same charge as do those patrolling a picket line. But the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication. The loyalties and responses evoked and exacted by picket lines, are unlike those flowing from appeals by printed words.

Similarly, in *K & K Construction Co. v. NLRB*, 592 F.2d 1228, 1234 n. 6 (3d Cir. 1979), in the context of a secondary activities dispute, the court noted:

> Traditionally, the public associates picketing with a labor dispute .... Thus picketing, because it instantly signals a labor dispute, is likely to signal to the public that the employer being picketed is unfair to labor. Handbilling and other

forms of publicity, on the other hand, are not likely to have the signal aspect of labeling the neutral as unfair .... Moreover, handbilling and other informational devices are better adapted at truthfully advising the public.

Ultimately, however, the issue in the present case is not whether the activities of the petitioners which resulted in their discharge were "picketing or patrolling." The issue is whether the prohibition against this activity in the collective bargaining agreement was sufficiently specific so as to constitute a waiver of the petitioners' right to distribute leaflets. The collective bargaining agreement prohibited "picketing or patrolling," which are not defined anywhere in the agreement. The terms "leafletting" or "handbilling" do not appear in the agreement.[4] The section of the collective bargaining agreement with which we are dealing is basically a "no strike" clause, and is designated as such in the agreement. Its prohibitions against picketing or patrolling are in reference to other activities associated with a strike or a slowdown. There is no allegation that any of the petitioners, or the leaflets they distributed, attempted to discourage anyone from doing business with the hospital. In fact, as the petitioners note, such activity would have been counterproductive to their efforts to prevent the proposed job eliminations. The petitioners' group distribution of leaflets was not clearly in violation of the terms of the collective bargaining agreement. Furthermore, the uncertainty as to the meaning of the terms "picketing" and "patrolling" within the context of this collective bargaining agreement provision falls well short of the "clear and compelling" test set forth by the United States Supreme Court in *Curtis Publishing Co.*, so as to constitute a waiver of the petitioners' right to distribute leaflets.

We therefore hold that, under the First Amendment to the United States Constitu-

---

**4.** We must emphasize at this point that even if these terms had been included in the collective bargaining agreement, the hospital would still have to show a substantial relationship to a compelling state interest under article III, §§ 1, 7, and 16 of the West Virginia Constitution in order to sustain their constitutionality. We merely note their absence in the context of our discussion of the federal constitutional issue in order to illustrate the uncertain applicability of the provision in question to the activities engaged in by the petitioners.

tion and under article III, §§ 1, 7, and 16 of the West Virginia Constitution, the respondents' termination of the petitioner employees violated their fundamental constitutional free speech rights. Accordingly, we order the petitioner employees' reinstatement with back pay from the date of their individual discharges.

Writ granted.